IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| MICHELLE GRANT WILSON, | : | |
| Plaintiff, | : | |
| v. | : | No. 5:15-cv-00130-MTT-CHW |
| CAROLYN W. COLVIN, | : | Social Security Appeal |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Michelle G. Wilson's application for benefits. 42 U.S.C. Section 405(g). Because substantial evidence does not support the Commissioner's decision, it is **RECOMMENDED** that this case be **REMANDED** pursuant to "sentence four."

## BACKGROUND

Plaintiff Michelle Wilson filed an application for Disability benefits on July 16, 2010, (R. 149), alleging back injury, depression, anxiety, foot injury, hand injury, and knee injury. (R. 191). It was determined that she suffered from disorders of the back and affective mood disorders but her claim was denied initially and on reconsideration. (R. 74 - 77). A hearing was held in front of Carole Moore, an administrative law judge (ALJ), on October 18, 2013. (R. 38). The ALJ issued a decision denying Plaintiff's appeal on December 20, 2013, (R. 55), which the Administrative Appeal Council declined to review on February 24, 2015. (R. 1). Plaintiff now appeals to this Court challenging the Appeal Council's decision on the basis of newly submitted

1

evidence, including the opinions of two treating physicians opining that Plaintiff is incapable of work.

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the

impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## THE MEDICAL RECORD

The medical and opinion record in this case consists of the following. Plaintiff's initial evaluation and reconsideration (74 - 77), the Administrative Hearing in front of the ALJ (R. 38 - 73), various disability reports, function reports, and questionnaires (R. 178 – 234, 236 – 253, 259 – 266, 481 – 495, 575 - 584), Psychological Assessments performed by Duane A. Harris, Psy. D. and Melissa Hick, Ph.D. (R. 474 – 479, 557 - 560), an All Systems Exam (R. 510 – 514, 517 - 520), an Independent Medical Examination (R. 522 – 523) as well as medical records from the Georgia Neurosurgical Institute (R. 302 – 305, 614 – 620, 623 - 636), Harvey A. Jones, M.D. (R. 311 – 330), Orlando Balcos, M.D. (R. 402 – 419, 496 – 502, 755 - 759), Peach Regional Medical Center (R. 340 – 397, 420 – 422, 640 – 643, 679 - 754), Coliseum Medical Centers (R. 422 – 432, 914 – 916, 934 – 964, 975 - 100), Upson Regional Medical Center (R. 433 – 436), Orthopaedic Surgery and Sports medicine (R. 438 -  455, 525 – 554, 761 – 912, 917 - 933), the Medical Center of Central Georgia (R. 621 – 622), The Macon Surgical Associates (R. 965 – 974), Michael Wayne Early, M.D. (R. 460 – 473, 504 - 509), Crystal Brown, M.D. (644 – 676), and various imaging and diagnostic results (R. 331 – 336, 1111 – 1125).  The following evidence was submitted to the Appeal Counsel: evaluations of Dr. Havey Jones (R. 1132 – 1137) and Dr. Crystal Brown (R. 1138 – 1143); and treatment records from the Florida Pain Clinic.

*i.     Physical impairments*

The medical record in this case begins in June 2006 during office visits with Dr. Orlando Balcos. Dr. Balcos' treatment notes are largely not legible, but Plaintiff complained of pain in her knee and lower back and was prescribed Xanax. (R. 407). In July 2007, Plaintiff was referred to Middle Georgia Orthopaedic Surgery and Sports Medicine, where she was diagnosed with bilateral patellofemoral syndrome and degenerative joint disease. (R. 454). Plaintiff was given an injection of Xylocaine and Depo-Medrol in both knees. *Id*. Plaintiff's knees were X-rayed following a November 2007 car accident, and the results were unremarkable. (R. 453). Plaintiff was not seen at this location in 2008 and 2009. However, in May of 2010, Plaintiff went to the Georgia Neurosurgical Institute complaining of low back pain. (R. 302). Plaintiff's history included arthritis, hip pain, neck pain, back pain, extremity pain, foot/toe pain, difficulty walking, headaches, memory loss, sleeping problems, anxiety, depression, cold intolerance and a past history of foot/leg surgery. She was being prescribed Xanax, Lortab, and ibuprofen. (R. 302). An MRI without contrast was ordered and performed later that month, which revealed a small broad based disc bulge and mild facet osteoarthritis at L3-L4. (R. 305). The impression stated no large disc protrusion, canal stenosis, or foraminal narrowing, and the disc bulge had no corresponding "definite neural encroachment or canal stenosis."

In August 2010, Plaintiff returned to Middle Georgia Orthopaedic complaining of knee and lower back pain. (R. 450). Plaintiff stated that her symptoms had persisted for the past seven years, and described her left side pain a sharp, throbbing, and aching pain rated at 9/10. (R. 450). Plaintiff had diminished range of motion in her lumbar spine, her left knee was swollen with functional range of motion, and her strength was rated as 5/5 on all indicators reported. (R. 450 – 51). Plaintiff was assessed with Lumbar Radiculitis, Chondromalacia in the left knee, and

infrapatellar/subpatellar knee enthoseopathy. Plaintiff received a steroid injection and was prescribed Medrol, Flexeril, and Vicodin. (R. 452). Plaintiff's range of motion in her lumbar spine improved to "functional" on her next visit, but she continued to rate her pain as 8/10, was prescribed Percocet, and referred to a pain clinic. (R. 449). Her pain worsened at her next appointment in September, and her doctor opined that she was not doing "any better clinically" but would continue to be treated conservatively. (R. 446 - 47). Several weeks later, Plaintiff was prescribed a course of physical therapy for her knee and given a prescription of Percocet. (R. 445). In October, Plaintiff's medication was increased to include Neurontin and Soma due to persistent symptoms, and an MRI was ordered. (R. 443). The MRI revealed DJD of the left knee. (R. 441). Plaintiff continued to rate her pain as severe in early 2011 (R. 544) and was treated with narcotic pain medication and injections.

In February 2011, Plaintiff was treated by Michael Early, M.D. in relation to her disability claim. (R. 467). She reported a history of knee problems that are somewhat relieved with injections, along with chronic back pain. Plaintiff also stated she had a history of depression and anxiety, for which treatment did not offer significant help. Plaintiff reported wearing a knee brace and ambulating with a cane "on the bad days." (R. 467). Plaintiff was not using an assistive device at the time of examination, had steady gait, mild grip strength weakness, and moderate weakness in her left leg. (R. 471). Plaintiff had mild edema in her left knee, such that degenerative joint disease was evident with crepitus. Her range of motion was also limited in her left leg. Dr. Early assessed Plaintiff with osteoarthrosis, chronic pain syndrome, high blood pressure, memory loss, genu valgum, lumbago, depressive disorder, anxiety disorder, and insomnia. (R. 471). A second consultative examination performed in October 2011 by Dr. Spivey revealed full range of motion in Plaintiff's lower extremities with 5/5 strength. X-rays

5

indicated mild degenerative changes in her left knee, with no evidence of trauma, and the conclusion was that Plaintiff "present[ed] with subjective complaints and minimal objective findings." (R. 523). The October 2010 MRI had revealed "mild tricompartmental osteoarthritis", small join effusion, and mild chondromalacia in Plaintiff's knee (R 554) and multilevel degenerative spondylosis in her spine. (R. 811).

In July 2011, Plaintiff returned to Middle Georgia Orthopedics with 9/10 pain, difficulty walking and sitting, stiffness, swelling, and sleep loss. It was no longer recommended that Plaintiff continue with conservative treatment and she began receiving regular Supartz injections. (R. 549). In January 2012, Plaintiff was taking Neurontin, Lortab, Xanax, Ambien, Norco, Flexeril, Mobic, and Medrol and consultations were requested for both her knee and back. (R. 807). At her next appointment, the "possibility of a total knee arthroplasty" was considered. (R. 805). A surgical consultation was again discussed in February, and it was decided that Middle Georgia Orthopedic would continue to provide conservative treatment. (R. 800).

A neurosurgical consult was requested in March 2012, and Plaintiff returned to the Georgia Neurosurgical institute for treatment. Plaintiff had muscle strength 5/5 in all extremities, and there did "not seem to be too much in the way of peripheral arthritis." (R. 624). A lumbar myelogram and CT scan were ordered. The diagnostic impression from the CT was broad-based disc bulging, underlying degenerative changes, small spinal canal due to short pedicles, mild neural foraminal effacement, and asymmetrical soft tissue. (R. 615 - 616). The myelogram found "impressions on thecal sac through the lumbar spine" as well as "neural foraminal narrowing at the distal aspect of the lumbar spine." (R. 617).

In August 2012, Plaintiff accepted her doctor's recommendation to undergo arthroscopic surgery on her knee. (R. 774). On October 2, 2012, Plaintiff was administered general anesthesia

6

and a debridement of her medial femoral condyle and patella was performed. (R. 767). Plaintiff underwent a bioposy in March 2012 (R. 973)

  *ii. Mental Impairments*

As discussed above, Dr. Balcos' treatment notes are mostly illegible, but he appears to have been treating Plaintiff for depression and anxiety. In February 2011, at a consultative examination with Dr. Early, Plaintiff reported problems thinking, depression, anxiety, and getting very upset. (R. 504). She was being prescribed Xanax. In May 2011, a psychological assessment was performed by Duane Harris, Psy. D. (R. 474). Plaintiff ambulated without assistance and remained seated without breaks during the entire evaluation. (R. 477). Plaintiff's memory appeared to be intact, her judgment was fair, her abstraction was poor to fair, her concentration was adequate, and she expressed irritation throughout the interview. (R. 478). Ultimately, diagnostic impressions were deferred because "Ms. Wilson's response style to the Rey 15 and ADI confounded the diagnostic picture." (R. 479). Plaintiff underwent a second psychological evaluation in January 2012, performed by Melissa Hicks. (R. 557). Plaintiff was diagnosed with rule out anxiety disorder and depression and her GAF was assessed at between fifty-five and sixty-five. (R. 559).

Plaintiff sought treatment with Dr. Brown for anxiety and hypertension beginning in October 2012. Plaintiff was prescribed citalopram and alprazolam. (R. 658). At her next appointment in November, Plaintiff was assessed with anxiety with rapid heartbeat, emotional lability, and depression. (R. 656). This treatment continued through 2013.

### iii.  Newly Submitted Evidence

The following medical record was submitted to the Appeals Council and was not considered by the ALJ. On December 17, 2010, Tara Marchand, an occupational therapist[1], performed a functional capacity evaluation "to determine this client's tolerance to perform work tasks." (R. 1125). Ms. Marchand opined that Plaintiff can perform light-medium work, but found significant limitations. (R. 1126). Ms. Marchand found that Plaintiff can perform the following for only 1-33% of the day: sit, stand, walk, repetitively stoop, sustained stoop, repetitive crunch, sustained crunch, reach repetitively at waist high, and reach above shoulder height. (R. 1126). Plaintiff "performed with full effort" and demonstrated "maximum effort," and the test results were considered valid per Plaintiff's heart rate, dissimulation, test-retest, and manual muscle testing. (R. 1127). In the pain evaluation, Plaintiff's response to "visual analog scale" was inappropriate, but she had appropriate pain behaviors, appropriate Rainsford pain drawings, and appropriate responses on an inappropriate illness questionnaire. She did not exhibit Waddell signs. Plaintiff had functional range of motion and strength but exhibited inflammatory responses to exercises which limited her upper extremity endurance on all tests. Plaintiff was determined not to be capable of grasping, fingering, torqueing, linear reaching, and above shoulder reaching more than 100 reps/day or for more than 2.5 hours a day. (R. 1131). She exhibited spasms during the test in her right upper shoulder/neck as well as consistent head tremors. (R. 1131).

A disability assessment from Dr. Jones stated that Plaintiff was totally disabled beginning in 2010 due to being unable to walk over 100ft, unable to stand over 5 minutes, unable to sit over five minutes, and unable to bend or stoop. (R. 1133). These limitations were due to chronic neck and back pain, degenerative and bulging discs, arthritis in her shoulder and knee, general anxiety,

---

[1] Physical therapists may be entitled to great weight under certain circumstances, *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1188 (N.D. Ala. 2006), but are not entitled to the same deference of a treating physician. *Freeman v. Barnhart*, 220 F. App'x 957, 961 (11th Cir. 2007).

8

and major depression. (R. 1132). A disability statement from Dr. Brown stated that Plaintiff suffers from chronic pain, joint pain, and pain on motion with decreased motion in her knees, hips, shoulders, back, and neck. (R. 1138). In her opinion Plaintiff has limitations in walking, standing, lifting, carrying, pushing, pulling, lifting, and stooping. (R. 1138 – 39)

The Appeals Council also considered treatment notes from the North Florida Pain Center dated August 2010 to September 2012. Plaintiff initially sought treatment following her motor vehicle accident for "severe constant neck and lower back pain with distribution shoulders upp ext, hips, and b/l lower extremities." (R. 1019). Plaintiff had normal motor strength, limited range of motion in her lumbar spine with spasms, and was initially prescribed Mobic, Lortab, Amrix, Adipex, Lyrica, and Percocet. (R. 1020). She was diagnosed with spondylosis with myelopathy, lumbosacral spondylosis and cervical sprain. Plaintiff received an epidural steroidal injection on August 27, 2010, (R. 1022), and September 10, 2010. (R. 1023). On September 14, 2010, she followed up reporting no improvement with injection and suffering from sharp, aching, and shooting pain aggravated by walking, sitting, standing, and movement. (R. 1014). Plaintiff continued to have normal motor strength, but exhibited tenderness, positive straight leg, myofascial trigger points with taut bands, limited range of motion in her neck and shoulder, and muscle spasms. (R. 1024).

Plaintiff returned on September 27, 2010, complaining of severe, constant neck pain. She was assessed "with cervical dystonia and a recommendation of botox injections." (R. 1026). She continued to exhibit "significant muscle spasm[s]" in her lumbar and cervical spine with limited range of motion, tenderness, myofascial trigger points, and positive straight leg test. (R. 1027). Plaintiff began treatment with botox, reporting only minimal improvements, and underwent additional epidural steroidal injections on October 13, 2010. (R. 1032). The treatment was

unsuccessful, and Plaintiff's pain management regimen was changed to include Duralgesic patch, Nuncynta, botox injections, and Depo-medrol epidural injections. (R. 1036). Plaintiff received injections on February 8, 2011, (R. 1041), April 5, 2011, (R. 1045), May 3, 2011, (R. 1049), May 26, 2011 (R. 1053), July 19, 2011 (R. 1060), August 2, 2011 (R. 1061), September 13, 2011 (R. 1068), December 2, 2011 (R. 1075), December 16, 2011 (R. 1076), January 6, 2012 (R. 1080), February 24, 2012 (R. 1087), May 24, 2012 (R. 1094). On July 10, 2012, a "standing order for PRN TPI to the C-Spine" was entered (R. 1101) and Plaintiff continued to have regular injections until the end of the record. In April, she was taken off of Nucynta, and started on Neurotin and Ultram, (R. 1048), and she received additional botox shots in June. (R. 1056).

In October, Plaintiff's condition was described as "one that is chronic and will not improve in the near future" (R. 1071). A routine urine screen conducted to ensure medication compliance came back "OK." (R. 1072). Plaintiff's Duralgesic patch dosage was doubled in November. *Id*. In June 2012, she was assessed with "involuntary spasms causing head tilting and pain chronically." (R. 1086). An MRI of Plaintiff's thoracic spine was unremarkable (R. 1122). However, an MRI of Plaintiff's cervical spine in September 2010 revealed disk herniation, impingement, abutment to the spinal cord, abnormal spinal curvature indicating spasm, spinal stenosis, covered disk bulge, arthritis, and neural formal stenosis. (R. 1123). A Lumbar MRI performed in August 2010 revealed central disk herniation "superimposed upon a circumferential disk bulge and degenerative disk disease resulting in impingement upon thecal sac" and neural foramina stenosis. (R. 1123). A "nerve conduction study and electromyography of the upper and lower extremities" was also normal but reviewed a history of diagnostic imaging revealing disc herniation, impingements, abnormal spinal curvature, myospasms, stenosis, spinal arthritis, foraminal stenosis, impingements on the thecal sac. (R. 1123 – 24).

## DISABILITY EVALUATION IN THIS CASE

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since January 1, 2010. (R. 14). At step two, the ALJ found that Plaintiff suffered from the following severe impairments, "cervical and lumbar disc disease, osteoarthritis of the knees and left shoulder, chondromalacia of the left knee status post arthroscopic debridement of the medial femoral condyle and later release, and obesity." (R. 14). The ALJ further determined that Plaintiff's hand impairment and mental impairments were nonsevere. (R. 15). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 16). The ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work with limitations. (R. 16). Those limitations included sitting and standing each for no more than six hours during an eight hour work day, never climbing ladders, rope, and scaffords, and only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouch, crawling, and overhead reaching. (R. 16 -17). At step four, the ALJ determined that Plaintiff could not perform past relevant work as a "dialysis tech." (R. 29). Thus, the ALJ determined that Plaintiff was not disabled from January 1, 2010, to the date of the decision. (R. 30).

## ANALYSIS

Plaintiff does not contend that the ALJ committed error by denying Plaintiff's request for benefits. Instead, Plaintiff argues that the Appeals Council committed error by denying review of the ALJ's decision. Plaintiff argues both that the Appeals Council ignored the evidence

11

submitted to it and committed error by failing to find disability in light of the new evidence.[2] The new medical evidence includes extensive and consistent pain management treatments as well as the opinions of two treating physicians stating that Plaintiff is disabled. According to Petitioner, this lends additional credibility to Plaintiff's testimony and directs a finding of disability.

      i.    *Appeals Council's Duty Generally*

As an initial matter, if the Appeals Council denies review where new evidence has been submitted and accepted, "the Appeals Council must show in its written denial that it has adequately evaluated the evidence." *Flowers v. Comm'r of Soc. Sec.*, 441 F. App'x 735, 745 (11th Cir. 2011). This showing does not require the Appeals Council to "make specific findings of fact when it denies review." *Parks ex rel. D.P. v. Commissioner, Social Sec. Admin.*, 783 F.3d 847, 852 (11th Cir. 2015). Instead, the Appeals Council need only show that it considered any new, material, chronologically relevant evidence. Therefore, the Appeals Council need not provide a detailed discussion of that new evidence when denying a request for review, and it is sufficient for the Appeals Council simply to state that it considered the additional evidence[3]. *Id.* (citing *Mitchell v. Commissioner, Social Sec. Admin.*, 771 F.3d 780, 783 (2014)).

Here, the Appeals Council stated that it considered Plaintiff's exhibits, listed the additional evidence as an exhibit, and made the additional evidence part of the record. The Council further stated that it considered the record as a whole, and found that the new

---

[2] Respondent argues that Plaintiff is only contesting whether the AC considered the newly presented evidence. Plaintiff's argument is both that the new evidence directs a finding of a sub-sedentary RFC and that the AC did not properly consider the new evidence because the AC failed to overturn the ALJ's light RFC.

[3] Compare *Flowers*, 441 F. App'x at 745 (citing *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980)) ("If the appeals council merely 'perfunctorily adhere[s]' to the ALJ's decision, the Commissioner's findings are not supported by substantial evidence and we must remand 'for a determination of [the claimant's disability eligibility reached on the total record.'"). "[N]ew evidence . . . warrants a remand, if 'there is a reasonable possibility that the new evidence would change the administrative outcome.'" Id. (citing *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987)).

information did not provide a basis for changing the ALJ's decision—nothing more is required from the Appeals Council pursuant to *Parks.*

The decision of the Appeals Council is still subject to review, however. "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Ingram v. Comm. Of Social Security*, 496 F.3d 1253, 1262 (11th Cir. 2007). Thus, "on appeal, when the Appeals Council denies review based on new evidence, our review considers whether the claimant's new evidence 'renders the denial of benefits erroneous.'" *Atha v. Commissioner*, *Social Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015) (citing *Ingram*, 496 F.3d at 1262). This court must consider whether the additional evidence presented to the Appeals Council rendered the ALJ's opinion no longer supported by substantial evidence. *Mitchell v. Commissioner, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014). In this case, Plaintiff straightforwardly argues that newly submitted physician opinions are entitled to be afforded substantial weight and that they conflict with the ALJ's RFC. Therefore, according to Plaintiff, the decision cannot be based on substantial evidence.

"In view of the weight afforded the opinion of a treating physician, analysis from the Appeals Council or remand to the ALJ for such analysis would be particularly helpful when the new evidence constitutes the only record evidence as to the opinion of the treating physician". *Meyer v. Astrue*, 662 F.3d 700, 706 (4th Cir. 2011) (internal citations omitted). However, "the lack of such additional fact finding does not render judicial review 'impossible'" if the record provides "an adequate explanation of the decision." *Id*. (citing *Deloatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). On this record, the ALJ's decision is adequate for review but is no longer supported by substantial evidence.

*ii.     The ALJ's Decision*

The ALJ's decision did not explicitly assign weight to any treating physician's opinion and afforded little weight to the opinions of agency reviewers. The ALJ further accepted the consulting examiner's assessment of Plaintiff's objective functioning, but neither examiner provided an opinion concerning her functional abilities. The ALJ discredited Plaintiff's claims of disability because she was (1) receiving generally conservative treatment, (2) was not prescribed narcotic pain medication, (3) the record lacked corroborating objective medical evidence, and (4) no physician opined that Plaintiff had a disabling level of impairment. These findings were supported by substantial evidence based on the record before the ALJ.

In her appeal, however, Plaintiff submitted new evidence which contradicted each one of these assessments. Records from the North Florida Pain Center show that Plaintiff received a higher level of treatment than found within record before the ALJ. Treatment of Plaintiff's pain included narcotic pain medications, routine steroidal injections, opioids, and pain patches. At this level of treatment, Plaintiff's pain was not significantly reduced. Records from Dr. New and Ms. Marchand show that diagnostic imaging not considered by the ALJ revealed significant objective findings in Plaintiff's lumbar and cervical spine. Plaintiff also underwent a comprehensive evaluation of her physical capacities which determined her to be significantly limited due to pain. These limitations were not in range of motion or muscle strength, but in endurance and pain. Finally, two physicians opined that Plaintiff suffers from a debilitating level of impairment, and the objective findings of a third directly contradict the RFC. Each one of the ALJ's major findings is contradicted by the new evidence submitted, and the decision is no longer based on substantial evidence.

*i.     Pain*

The ALJ concluded, after a thorough review of the record, that the objective evidence did not support Plaintiff's allegations of pain. The record reflected that Plaintiff had consistently rated her pain as severe, but was rarely prescribed narcotic pain medication. The ALJ specifically noted that Plaintiff was originally prescribed non-narcotic pain medication by her orthopedist. The ALJ also stated, at least sixteen times, that Plaintiff's treatment was unchanged. The ALJ also determined that Plaintiff refused to address her back pain with steroidal injections.

These findings, while correct at the time of decision, are contradicted by the newly presented evidence. Plaintiff's back pain and symptoms were primarily addressed through her pain clinic. Instead of refusing steroidal injection, Plaintiff received bimonthly injections for much of the record. Likewise, rather than only being prescribed non-narcotic pain medication, Plaintiff was prescribed multiple narcotic pain medications as well as high-strength opioids, pain patches, anti-inflammatories, and botox injections. The new evidence creates a substantial shift not only as to Plaintiff's level of treatment, but also as to her underlying conditions. The record before the ALJ focused on pain associated with Plaintiff's knee, which the ALJ appropriately concluded was resolved with surgery. The new evidence suggests that the primary source of her limitations is related to cervical and lumbar spine abnormalities. The ALJ's findings regarding Plaintiff's pain are not supported by substantial evidence.

*ii.    Physical Exams and Objective Medical Record*

Plaintiff's allegations of physical limitations were generally discredited by the ALJ based on examinations performed by Dr. Early and Dr. Spivey. (R. 522, 512). Both doctors noted Plaintiff's allegations of chronic pain, but failed to find corroborating functional limitations. Her strength and range of motion—the two functional areas both doctors tested—were generally

15

intact. The gap between Plaintiff's allegations and the objective findings resulted in neither doctor assessing her total functional abilities. Dr. Early, however, opined that she suffered from limitations and diagnosed Plaintiff with chronic pain syndrome, lumbago, and osteoarthritis. Dr. Spivey presented a limited list of activities she could perform, and recommended further testing. The ALJ relied heavily on these findings, stating "as to the claimant's physical allegations, given the amount of pain she has alleged through the record, even prior to her knee surgery, consultative examiners have found little in the way of objective findings . . . the claimant's subjective complaints outweighed the objective evidence. (R. 28). Both doctors and the ALJ focused on Plaintiff's physical limitations as related to her knee. She presented allegations of treatment for her back pain and allegations that it was debilitating and not relieved with treatment, but the medical record was not corroborative.

The newly presented evidence contradicts not only the doctors' focus but also their assessment of the objective record. As discussed above, Ms. Marchand performed a rigorous assessment of Plaintiff's functional abilities. The findings were consistent with those in the record, but Ms. Marchand tested additional areas not previously considered. Plaintiff's range of motion and muscle strength were generally intact, but her endurance and repetitive abilities were significantly limited by pain. This finding is somewhat reflected in Dr. Early's assessment of chronic pain.

Ms. Marchand opined that Plaintiff was capable only of light-medium work. The details of her exam suggest, however, that Plaintiff cannot sustain any level of activity for more than a few hours. Because Ms. Marchand's testing was more rigorous than the consulting examiners' testing, it is likely that her opinion is preferable. To the extent that the ALJ determined Plaintiff

to be a malingerer, Ms. Marchand's assessment provides objective indications that she was putting forth maximum effort and showed appropriate pain responses.

In addition to the physical examination, Ms. Marchand's treatment record provides additional imaging and clinical interpretation of that imaging. Although Plaintiff does not contest the ALJ's decision, the ALJ significantly underrepresented the results of Plaintiff's myelogram. The ALJ stated that the March 16, 2012, myelogram showed "mild underlying degenerative changes and a mild disc herniation." (R. 25). In fact, Plaintiff had neural foraminal narrowing, impressions on the thecal sac throughout the lumbar spine, short pedicals, disc bulges throughout, and a small spinal canal. (R. 615 – 617). The two MRIs considered by the ALJ were correctly assessed, but clearly contradicted by MRIs reported in Plaintiff's newly submitted evidence. While the May 2010 MRI merely showed small disc bulging, MRIs conducted in August and September 2010 showed disc bulge, impingement, stenosis, and degenerative changes. The new evidence provides objective anatomical and functional findings supporting Plaintiff's allegations.

    *iii.   Physician Opinions*

Finally, and most significantly, the newly submitted evidence contains the opinions of two treating physicians, both indicating that Plaintiff suffers from a disabling level of functional limitations. The first opinion, from Dr. Jones, clearly contradicts the ALJ's RFC in that it states she cannot walk over 100 feet, cannot stand for more than five minutes, and is unable to sit for more than 5 minutes. The basis of his opinion is pain and arthritis, as well as abnormalities in Plaintiff's spine. The second opinion, from Dr. Brown, also contradicts the ALJ's RFC. In her opinion, Plaintiff suffers from chronic pain, joint pain, pain on motion, and decreased motion in

her neck, which results in pervasive limitations. (R. 1139). These opinions are entitled to substantial weight unless "good cause" exists to discredit them.

Respondent argues that neither doctor's opinion undercuts the substantial evidence supporting the ALJ's opinion. Specifically, Dr. Jones only treated Plaintiff for three months following the initial onset of her symptoms, and Dr. Brown did not actively treat Plaintiff for her physical impairments. While Respondent is correct that these factors may impact how much weight their opinions are entitled to, the contrary medical opinions in the record were discredited and were from non-treating, non-examining sources. They cannot constitute "good cause" to discredit Dr. Jones and Dr. Brown.

Further, Dr. Jones was in a unique position to provide information about Plaintiff because he treated her during sixteen sessions of physical therapy. Most notably, Dr. Jones determined that a "review of systems" would not contribute to her diagnoses or treatment, and the ALJ's decision is based largely upon all-systems exams performed by consulting examiners. Respondent's argument that Dr. Jones' opinion lacks support from his treatment notes does not necessarily follow from the record. Dr. Jones noted numerous abnormalities in Plaintiff's physical exam results, and her condition was unchanged by physical therapy.

Respondent assumes that Dr. Brown did not actively treat Plaintiff for physical impairments, and asserts that "generally normal physical examinations" within Dr. Brown's treatment notes are a basis for discrediting her opinion. Dr. Brown, however, variously assessed Plaintiff with osteoarthritis, low back pain, leg weakness, edema, joint pain, and intervertebral disc degeneration. There is also no indication that Dr. Brown's physical assessments were based on anything other than superficial observations and general appearance does not necessarily hold more weight than well-established diagnoses. Further, Dr. Brown ordered various lab values to

test for rheumatoid arthritis. The results of those values are not interpreted, but Dr. Brown diagnosed her with osteoarthritis at a later visit.

      *iv.*      *Conclusion of Law and Fact*

The commissioner asserts that *Robinson v. Astrue*, 365 F. App'x 993 (11th Cir. 2010), controls this case in that the Appeals Council is free to discount a treating physician's opinions without specific findings where good cause exists to do so. In *Robinson*, unlike here, the new evidence consisted of one treating physician's opinion related to the narrow issue of that Plaintiff's ability to walk. Because that opinion was contradicted by substantial evidence and the physician's other assessments, "the Appeals Council did not err in upholding the ALJ's denial of benefits without making any specific findings concerning the walking limitation." *Id.* at 997. In this case, by contrast, there was considerable new evidence contradicting the ALJ's findings.

The evidence must be considered in its entirety. As discussed above, the treating physician's opinions may be consistent with each other, Ms. Marchand, and the Florida Pain Clinic, but not with the ALJ's decision. The sources considered by the ALJ were likely treating Plaintiff conservatively precisely because they had referred her to specialists who were providing a receiving a higher level of care. The negative inferences the ALJ drew from Plaintiff's lack of treatment are no longer warranted, and nearly every essential factual conclusion drawn by the ALJ is now unsupported by the record. The record considered as a whole does not provide substantial evidence to support the Commissioner's decision.

## **CONCLUSION**

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **REMANDED** pursuant to "sentence four." Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of

time to file objections, WITHIN FOURTEEN (14) DAYS after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO ORDERED**, this 19th day of May, 2016.

                              s/ Charles H. Weigle_____
                              Charles H. Weigle
                              United States Magistrate Judge